Paul A. WETZEL, Plaintiff-Appellant,

v.

GULF OIL CORPORATION, a Pennsylvania corporation, et al., Defendant-Appellee.

No. 25864.

United States Court of Appeals,
Ninth Circuit.

Feb. 8, 1972.

As Amended March 2, 1972.

Manfred R. Wetzel, Phoenix, Ariz.,
for plaintiff-appellant.

Daniel Cracchiolo, of Burch, Cracchiolo, Levie & Guyer, Phoenix, Ariz., for defendant-appellee.

Before BROWNING and WRIGHT, Circuit Judges, and CRARY, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

Appellant Wetzel brought this action against the Gulf Oil Corporation in the Superior Court of Arizona for Maricopa County. He alleged intentional tort, breach of warranty, negligence, and defamation. He sought compensatory and punitive damages in excess of $55,000.

Defendant removed to the district court pursuant to 28 U.S.C. § 1441. The case was tried to a jury. At the conclusion of the evidence, the district judge directed a verdict for the defendant on the ground that plaintiff had failed to present evidence sufficient to sustain a favorable verdict. Wetzel appeals.

Wetzel's claims are threefold. First, he alleges that an attendant at a Gulf Oil Company service station, in the process of "topping up" the fluid in the braking system of Wetzel's automobile, put a foreign substance into the master cylinder. He alleges that several hours later, while he was driving, his brakes froze due to the foreign substance and his car rolled into an intersection out of control.

Although no accident resulted and Wetzel saw no physician for any injury arising from the incident, he asserts that his "life was placed in jeopardy and he suffered mental anguish, false imprisonment, and assault and battery and nervous shock to his systems." He seeks $2,500 for his mental anguish and $2,500 in punitive damages plus $15 for brake repairs and $30 for loss of the use of his car for two days.

Second, Wetzel contends that letters from Gulf to him concerning his failure to pay his gasoline bill were defamatory.

---

* Honorable E. Avery Crary, United States District Judge for the Central District of California, sitting by designation.

Finally, he claims that the manager of the Gulf station slandered him. Wetzel telephoned the station to maintain that Gulf should pay his repair bill. He says that in the course of the conversation the manager called him a "nut" and "crazy" and stated that he was "trying to get something for nothing."

Wetzel seeks $25,000 in general damages and $25,000 in punitive damages for defamation.

Under Rule 50, F.R.Civ.P., a directed verdict can be granted only when there is no controverted issue of fact upon which reasonable men could differ. The Supreme Court set forth this standard in Brady v. Southern Railway Co., 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943):

> "When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict."

We have stated:

> "[T]he question a trial court must answer in deciding whether to direct a verdict is 'whether the evidence in its entirety would rationally support a verdict for the plaintiff, assuming that the jury took, as it would be entitled to take, a view of the evidence most favorable to the plaintiff.' " Phipps v. N.V. Nederlandsche Amerikaansche S., M., 259 F.2d 143, 145 (9th Cir. 1958).

In considering a directed verdict we accept as true all of the testimony presented by the plaintiff and all of the favorable inferences flowing therefrom.

Applying this standard, after a thorough review of the record, we conclude that the plaintiff presented controverted issues of fact upon which reasonable men could differ on only one contention: did the Gulf station attendant put a foreign substance in the braking system of plaintiff's car, causing the brakes to be damaged and necessitating a repair bill of $13.50 and two days loss of use of the car? On all other issues plaintiff cannot succeed, either because of failure of proof or because the law does not allow recovery on his claims.

a. BRAKE FAILURE.

Plaintiff testified that he took his car to the Gulf station for service. The charge slip reflected that the attendant, with Wetzel's permission, added 50 cents worth of brake fluid to the braking system. Plaintiff's testimony, however, raised the possibility that the attendant may have taken fluid from the wrong container, perhaps using oil or cleaning solvent instead of brake fluid.

Plaintiff testified that his brakes froze and that his car rolled into an intersection out of control; that he was thereafter able to drive home, and the next day, to a garage only by using extreme caution, driving in low gear, and stopping with the hand brake.

At the garage he had repair work done which included draining and replacing the fluid in the braking system and replacing several rubber parts which had become swollen and damaged.

The garage owner testified that the fluid removed from the car smelled odd. He also testified that "the master cylinder was swollen up and that is caused by other substances."

We extract from the testimony of the mechanic:

> "Q. On this particular brake system of Paul's here, assuming someone put a foreign substance into his brake fluid and assuming he drove the car home three or four hours later, or two hours later, and then drove it again about 15 miles and let it set for about three and a half hours, would that total length of time, about five or six hours there, would a brake system swell up and freeze in that amount of time?

\* \* \* \* \* \*

"Q. MR. WETZEL: Could that happen?

"A. If there was mineral oil on it, yes. It is mineral oil that causes that to occur—but mineral oil would, any mineral oil.

"Q. Now, mineral oil comes in different consistencies, does it not?

"A. It wouldn't matter though.

"Q. You could have cleaning fluid, that is a mineral oil, isn't that correct?

"A. And gasoline would swell them up right quick.

"Q. How about cleaning solvents?

"A. That would do it too.

"Q. In fact, there is a fluid around your garage that could swell them, isn't that true?

"A. Yes.

\*   \*   \*   \*   \*   \*

"Q. From your examination of the brake system and brake fluid, could you arrive at any opinions as to the condition of the system or to the fluid?

"A. Well, all I remember about it is the master rubber was swollen up. My other man did do that, he was working on it, he said that something else was in the fluid, that's why he called me over. Yes, something caused it to swell up—seizes the cylinder piston."

The mechanic also testified that the mistaken introduction of harmful liquid into the braking systems of automobiles is not uncommon:

". . .—I remember lots of cases of doing that, people making a mistake, usually the car owner makes the mistake and puts lubricating oil in the master cylinder."

Gulf responds that no chemical analysis was performed on the fluid removed and that the "sniff" test was not reliable. Moreover, at most the attendant put only some, not all, of the allegedly harmful fluid into the car. The attendant merely filled a braking system that was low; he did not drain and refill the entire system. It would appear that 50 cents worth of fluid would be between a quarter and a half of the contents of the cylinder.

Gulf introduced evidence that the brake fluid sold at the station was free of defect.

Gulf further asserts that the low level of brake fluid at the time Wetzel brought in his car for service showed that he already had defective brakes. Finally, Gulf attacks generally the credibility of Wetzel, arguing that his story is "unlikely" and noting asserted inconsistencies.

However, all these points go to the credibility and weight to be accorded the plaintiff's evidence. They contest rather than remove from the case the issues Wetzel raises. These are matters for the trier of fact.

■ We believe that the evidence presented by the plaintiff and summarized above is sufficient to go to the jury on the issue of whether the Gulf attendant put a foreign substance into Wetzel's braking system, thereby causing him the expense of $13.50 in repairs and the loss of the use of his car for two days. Since he claims $15 per day for two days, the maximum amount Wetzel could recover on this claim is $43.50.

b. MENTAL ANGUISH AND PUNITIVE DAMAGES.

■ Wetzel cannot, however, recover damages for mental anguish. Both parties argue that Arizona follows the Restatement (Second) of Torts. Our research does not indicate to the contrary. See Hardy v. Hull Corporation, 446 F.2d 34 (9th Cir. 1971); O. S. Stapley Co. v. Miller, 103 Ariz. 556, 447 P.2d 248 (1968); Savage v. Boies, 77 Ariz. 355, 272 P.2d 349 (1954).

■ Wetzel did not present a shred of evidence indicating malice or intentional introduction of defective brake fluid or other foreign substance into his braking system. He introduced nothing to show the "extreme and outrageous conduct" necessary under § 46 of the Re-

statement. Nor did he bring into the case any issue of conduct involving "an unreasonable risk of causing distress" as required by § 313. Nor are §§ 323 and 436 at all relevant, no "physical harm" having been shown.

Rather, § 436A of the Restatement controls:

"§ 436A. Negligence Resulting in Emotional Disturbance Alone

"If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."

■ Wetzel clearly did not suffer any bodily harm. Nor did his car strike any other car or object, causing "compensable damage."

Thus the only issue under § 436A is whether recovery for the cost of repairing his brakes and the inconvenience of being without his car for two days would permit recovery for mental anguish and punitive damages as well.

In the absence of more specific guidance from Arizona case law than appellant has cited or we have found, we are unwilling to hold that Arizona would take so permissive a view of § 436A.

The official comment to § 436A provides:

"a. The rule stated in this Section stands in contrast to those stated in §§ 46 and 48, as to the intentional infliction of emotional distress. It is also to be contrasted with the rules stated in § 436, under which an actor who has negligently created an unreasonable risk of causing either bodily harm or emotional disturbance to another becomes subject to liability for bodily harm brought about solely by the internal operation of emotional disturbance. Under the rule stated in this Section, the negligent actor is not liable when his conduct results in the emotional disturbance alone, without the bodily harm or other compensable damage. The difference is one between the negligent automobile driver who narrowly misses a woman and frightens her into a miscarriage, and the negligent driver who merely frightens her, without more.

"b. The reasons for the distinction, as they usually have been stated by the courts, have been three. One is that emotional disturbance which is not so severe and serious as to have physical consequences is normally in the realm of the trivial, and so falls within the maxim that the law does not concern itself with trifles. It is likely to be so temporary, so evanescent, and so relatively harmless and unimportant, that the task of compensating for it would unduly burden the courts and the defendants. The second is that in the absence of the guarantee of genuineness provided by resulting bodily harm, such emotional disturbance may be too easily feigned, depending, as it must, very largely upon the subjective testimony of the plaintiff; and that to allow recovery for it might open too wide a door for false claimants who have suffered no real harm at all. The third is that where the defendant has been merely negligent, without any element of intent to do harm, his fault is not so great that he should be required to make good a purely mental disturbance.

"c. The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in

the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.

*"Illustration:*

"1. A negligently manufactures and places upon the market cottage cheese containing broken glass. B purchases a package of the cheese, and upon eating it finds her mouth full of glass. She is not cut or otherwise physically injured, and she succeeds in removing the glass without bodily harm; but she is frightened at the possibility that she may have swallowed some of the glass. Her fright results in nausea and nervousness lasting for one day, and in inability to sleep that night, but in no other harm. A is not liable to B."

In the light of this comment and in the absence of specific guidance from Arizona case law, we read § 436A to require bodily harm, or compensable damage flowing from emotional distress, *i. e.,* miscarriage or perhaps long continued mental disturbance. We do not read it as permitting Wetzel to recover damages for mental anguish without bodily harm, compensable damage flowing from emotional distress, or contact between his car and another car or object.

Under the circumstances, Wetzel has also clearly failed to raise the possibility that he would be entitled to punitive damages.

c. LIBEL.

■ Wetzel contends that letters from Gulf to him asking him to pay his gasoline bill were defamatory.

When Gulf refused his demand that it pay his bill from the garage which had drained his braking system and replaced the rubber parts, Wetzel countered by refusing to pay his gasoline bill. He withheld payment of $35.06, of which 50 cents represented the charge for the allegedly defective brake fluid.

We have reviewed the letters and find that none of them is defamatory. The strongest statement, appearing in the final letter, is an appeal for payment. It includes carefully drafted language to the effect that if Wetzel did not pay his bill the company would have no alternative but to turn the account over to a collection agency, "a procedure that can only mean embarrassment, inconvenience, and additional expense to you." We do not find such a letter to be defamatory.

■ Moreover, all of the letters were sent directly to Wetzel; none was sent to a third party. Hence Wetzel has failed utterly to show publication of the allegedly defamatory writings. His assertions in his brief on appeal that Gulf informed third parties that his credit rating was bad are simply not substantiated by the record.

Moreover, at the most, such letters could only have been libel *per quod,* as distinguished from libel *per se.* And Wetzel did not introduce any valid and sufficient evidence of actual damage. He testified that he had once been denied credit by Bank of America. However, he did not state how much credit he had sought, nor why he was refused. On cross-examination he conceded that he had not inquired why he was refused. And it appeared that he had a Bank of America credit card.

Thus Wetzel failed to show libelous writings, publication, or special damages.

d. SLANDER.

Wetzel cites McClinton v. Rice, 76 Ariz. 358, 265 P.2d 425 (1953), for the proposition that words such as "nut" and "crazy" are libelous *per se* even when spoken in argument over a commercial matter. That case, however, involved communication to third parties of an allegedly false charge that the plaintiff

had committed a crime. This is not such a case.

■ Rather we believe that an Arizona court would find that these words were not libelous at all in their context. *Cf.* Cinquanta v. Burdett, 154 Colo. 37, 388 P.2d 779 (1963). At the very most they might be considered libelous *per quod.*

■ However, plaintiff would still have to show publication and special damages to recover for libel *per quod.* The only party alleged to have overheard these remarks was Wetzel's father who was allegedly listening, unknown to the station manager, on an extension phone. It is not necessary for us to determine whether this was publication or whether the father was plaintiff's agent. There was no testimony that the father believed the remarks, thought less of his son because of them, etc. Nor was there testimony that there was any adverse effect on Wetzel's business, credit rating, reputation, social standing, etc., because of these remarks. Hence, even if there were publication, there was no damage.

e. DISPOSITION.

This leaves Wetzel with sufficient evidence to go to the jury on only one claim: damage to his brakes and loss of use of his automobile for two days. On this claim his maximum possible recovery is $43.50. On all other claims the directed verdict is affirmed.

■ Federal jurisdiction having attached when the defendant removed to the district court, that court retains jurisdiction to dispose of this matter. Saint Paul Mercury Indemnity Co. v. Red Cab Company, 303 U.S. 283, 58 S. Ct. 586, 82 L.Ed. 845 (1938). However, in view of the cost of a full jury trial on a claim involving only $43.50, we hope that the parties will be able to resolve the remaining claim without that being necessary.

Each party will bear its own costs on this appeal.

The directed verdict is affirmed except as to the claim for damages to the braking system and loss of use of the automobile for two days. That claim is remanded to the district court for further proceedings not inconsistent with this opinion.